864 So.2d 1013 (2004)
Frank GORDON, Appellant,
v.
MISSISSIPPI EMPLOYMENT SECURITY COMMISSION, Appellee.
No. 2002-CC-01468-COA.
Court of Appeals of Mississippi.
January 27, 2004.
*1014 James A. Williams, Brookhaven, attorney for appellant.
Albert B. White, Madison, attorney for appellee.
Before SOUTHWICK, P.J., THOMAS and IRVING, JJ.
IRVING, J., for the Court.
¶ 1. This appeal arises from a decision of the Circuit Court of Lauderdale County affirming the decision of the Board of Review of the Mississippi Employment Security Commission (MESC) denying unemployment benefits to Frank Gordon. Feeling aggrieved, Gordon appeals and assigns as error the determination by the circuit court that substantial evidence exists to support the finding by the MESC that he was terminated because of misconduct as that term is used within the applicable statutes and decisional law.
¶ 2. We find that the decision of the MESC, considered via the appropriate standard of appellate review, lacks evidentiary undergirding. Therefore, we reverse and render the decision of the MESC and the order of the trial court affirming the decision and remand the case to the MESC for a determination and an award of unemployment compensation benefits.

FACTS
¶ 3. Frank Gordon was employed by Riley Hospital as a housekeeper from December 6, 2000, to January 23, 2001. On January 23, 2001, Gordon's supervisor discovered Gordon bringing dirty linen through the clean linen area. The hospital's policy required that dirty linen be brought through a separate door because clean linen must be kept separate from dirty linen. As a result of this incident, Gordon was terminated from his employment with Riley Hospital.
¶ 4. After Gordon's termination, he filed for unemployment benefits. The claims examiner initially investigated by interviewing Gordon. The hospital's representatives were also interviewed. Gordon was disqualified for unemployment benefits on the basis of misconduct. Gordon appealed and after the hearing, the referee made the following findings of fact and opinion:
The claimant worked for Riley Hospital, Meridian, Mississippi, from December 06, 2000, until January 23, 2001, as a housekeeper. He was discharged for violation of company policy and for cursing his supervisor when she confronted him. The claimant transported soiled linen though the clean linen area which is a violation of the infection control policy. The claimant was advised of the employer's policies at the time that he was hired, and signed a department hazardous materials and waste training record that he received training. The claimant has denied that he had been trained concerning the transportation of soiled linen. However, he did admit that he cursed his supervisor.
* * * *
In this case, the referee realizes that there is conflicting testimony. However, more weight is placed on testimony of the employer and certain documents of evidence. The claimant's actions did rise to the level of misconduct as that term is used in the law. The decision of *1015 the claims examiner will be modified as to the beginning date of the disqualification period only.
¶ 5. Gordon appealed to the Board of Review (Board), and the Board affirmed the referee's decision. Gordon then appealed to the Circuit Court of Lauderdale Country which affirmed the decision of Board of Review of the MESC. Additional pertinent facts will be related during the discussion of the issue.

ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 6. An appellate court's review of a decision of the MESC is limited. Booth v. Miss. Employment Sec. Comm'n, 588 So.2d 422, 424 (Miss.1991). "When reviewing a decision of the MESC, this Court must affirm when the decision is supported by substantial evidence." Reeves v. Miss. Employment Sec. Comm'n, 806 So.2d 1178, 1179(¶ 5) (Miss.Ct.App.2002).
¶ 7. It is well established that this Court will give great deference to an administrative agency's findings and decisions. Allen v. Miss. Employment Sec. Comm'n, 639 So.2d 904, 906 (Miss.1994). "We will not reweigh the facts in a given case or attempt to substitute our judgment for the agency's judgment." Id. "We will overturn an agency's decision only where the agency's order: 1) is not supported by substantial evidence; 2) is arbitrary or capricious; 3) is beyond the scope or power granted to the agency; or 4) violates a person's constitutional rights." Id. "In any judicial proceedings under this section, the findings of the board of review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law." Miss.Code Ann. § 71-5-531 (Rev.2000).
¶ 8. The issue before us is whether Riley Hospital presented substantial, clear and convincing evidence that Gordon was terminated for misconduct as that term is defined in our statutory and decisional law, thereby undergirding the MESC's decision to deny unemployment compensation benefits. Stated another way, the issue is whether the decision of the MESC, denying unemployment compensation benefits to Gordon, is arbitrary and capricious and not supported by substantial evidence.
¶ 9. Robin Edwards, Gordon's supervisor, testified that when she confronted Gordon about bringing the dirty linen through the clean linen door, he said, "I'm tired of the m_____f telling me what I can and cannot do. If I want to bring the m_____f sheets through here, I will." Edwards testified that she reported the incident to her supervisor, Roy Childs, that Childs called Gordon into Childs's office but that she did not go in the office with Gordon.[1] After the office consultation, Childs terminated Gordon.
¶ 10. Edwards also testified that Gordon knew that bringing dirty linen through the door in which clean linen was moved was a violation of the hospital's policy. When she was asked by the claims referee how Gordon knew it was against the hospital's policy, Edwards answered, "[b]ecause he knew, because he was told the rules and procedures." The referee then asked Edwards who informed Gordon of the procedures, and she answered, "[w]here's that piece of paper? It's this procedure right here, Kathy Brown." Pursuant to the referee's request, Edwards showed the piece of paper to the referee. What was shown was a one-page document entitled "Department *1016 Hazardous Materials and Waste Training RecordTo be completed before employee's first work assignment." The document indicated, by a check in the yes column, that employee training had been provided for a number of things regarding the handling of hazardous materials, but it did not contain any indication that Gordon had been instructed or trained in the handling of dirty linen. This document contained the signature of Gordon as employee and the signature of Cathy Bryant as instructor.
¶ 11. Cathy Bryant did not testify, and neither did Kathy Brown, the person that Edwards identified as having informed Gordon of the rules and procedures relating to the handling of dirty linen. Perhaps, Edwards meant to identify Cathy Bryant, as opposed to Kathy Brown, as the person who informed Gordon of the rules. In any event, as already observed, neither Bryant nor Brown testified. After Edwards produced the "Department Hazardous Materials and Waste Training Record" as proof, which it was not, that Gordon had been instructed on the handling of dirty linen, Curnis Upkins with the Mississippi Hospital Association Diversified Services who was representing the hospital intervened:
Upkins: I'll show you a copy of one of the manuals that is shown to employees in that infection control area.
Q. (by referee) Did this go along with this?
Upkins: Yes ma'am.
Q. (by the referee) Okay, let the record show that Mr. Upkins has handed me a copy of an Infection control, page 3 of 4, and has highlighted linen, clean linen will not be transported nor moved through the same pass as soiled linen. Is this the copy from the handbook?
Upkins: From the manual, Infection Control Manual.
Gordon, who represented himself in the hearing before the referee, objected to both documents.
¶ 12. Edwards admitted that an employee would not be fired for a single incident of moving dirty linen though the clean linen area. This is what the records shows:
Q. Alright. Is this grounds for automatic termination, to move this clean linen, I mean dirty linen on the clean linen side? I mean is that one thing there, would that be enough to discharge somebody? Ms. Edwards?
A. No, it wouldn't.
Q. Okay, and did anything else happen on that day that he brought the dirty linen through the clean side?
A. Yes, he was insubordinate toward me.
Q. Okay, And what did he say?
A. He said I'm tired of the m_____ f_____ telling me what I can and cannot do. If I want to bring the m_____ f_____ sheets through here, I will. And he took it through there anyway, and walked out and slammed the door.
Q. Okay. And did you report this to your supervisor?
A. Yes, I did.
Q. And what was the result of that?
A. He, he.
Q. Who did you report it to?
A. Roy Childs.
* * * *
Q. And who terminated him?
A. Roy Childs.

*1017 * * * *
Q. Okay, had anything like this ever happened before?
A. No, it hadn't.
Q. Okay, was there anything else that would have brought about his discharge?
A. No.
¶ 13. Besides the statement by Upkins, who was not sworn to give testimony at the hearing, there was no evidence that Gordon had been given a copy of the Infection Control Manual or that he had even seen it before. The one sheet which was extracted from the manual does not bear Gordon's signature. The "Department Hazardous Materials and Waste Training Record" sheet which Gordon signed does not indicate that any documents were attached to it. It appears to be a complete document in and of itself. Gordon testified that he did not get a copy of the infection control policy.
¶ 14. Gordon also testified that the door, through which he would have normally carried the soiled linen, was locked and that he waited approximately thirty minutes for his supervisor to unlock it. He further testified that he was trained by someone named Fred and that Fred told him that if the dirty linen door was locked, he should take the dirty linen through the other door, the one for the clean linen. Additionally, Gordon testified that "No one ever told me that that was, I wasn't supposed to go through that door, until that Sunday morning I came in. Alright." Moreover, he testified that Edwards "came down there hollering, and she was cursing when she came down there." He admitted, however, that she was not cursing him. He further admitted that he also cursed but denied that he cursed Edwards. He admitted to saying, "I'll be damned, just like that, I couldn't do my work."
¶ 15. The only reason that was offered during the hearing for Gordon's termination was the incident concerning the movement of the dirty linen. That explanation was offered at the very beginning of Edwards's testimony:
Q. And what was the specific incident that happened on the last day he worked to cause his separation?
A. He was, he was bringing dirty linen through the clean side of the laundry, which that's against the rules and procedures of the hospital.
¶ 16. We perhaps can infer that the verbal altercation between Edwards and Gordon also may have played a part, although no one, not even Edwards, testified that was the reason. She simply testified that the altercation occurred and that she reported it to her supervisor. She was not in the office with Gordon and Childs when Childs terminated Gordon. Gordon testified that Childs did not give him an explanation for the firing, that Childs just said, "well, you're gone, just like that." No one testified that the alleged profanity by Gordon was efficacious in bringing about his termination. No evidence was presented regarding the hospital's policy on profanity if indeed it had one. While there were some statements made by hospital officials during the investigative stage that Gordon was terminated because of his use of profanity toward his supervisor and that use of profanity is grounds for automatic termination, no such testimony was given during the hearing before the referee.
¶ 17. In Wheeler v. Arriola, 408 So.2d 1381 (Miss.1982), our supreme court stated that "conduct may be harmful to [an] employer's interests and justify the employee's discharge; nevertheless, it evokes the disqualification for unemployment insurance benefits only if it is wilful, wanton, or equally culpable." Id. at 1383 (quoting Jacobs v. Cal. Unemployment Ins. Appeals *1018 Bd., 25 Cal.App.3d 1035, 1037, 102 Cal. Rptr. 364, 366 (1972)).
¶ 18. Section 71-5-513 A(1)(b) of the Mississippi Code of 1972, provides that "an individual shall be disqualified for [unemployment] benefits ... for misconduct connected with his work if so found by the commission." Miss.Code Ann. § 71-5-513 A(1)(b) (Rev.2000).
¶ 19. The Mississippi Supreme Court has defined misconduct as:
conduct evincing such willful and wanton disregard of the employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect from his employee ... carelessness and negligence of such degree, or recurrence thereof, as to manifest culpability, wrongful intent or evil design, and showing an intentional or substantial disregard of the employer's interest or of the employee's duties and obligations to his employer, [come] within the term. Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, or inadvertence and ordinary negligence in isolated incidents, and good faith errors in judgment or discretion [are] not considered misconduct within the meaning of the statute.
Wheeler, 408 So.2d at 1383. "The employer bears the burden of showing misconduct by clear and convincing evidence." Trading Post, Inc. v. Nunnery, 731 So.2d 1198, 1202(¶ 15) (Miss.1999).
¶ 20. Based on the facts discussed in the earlier portion of this opinion, we find that the employer, Riley Hospital, failed to demonstrate by substantial, clear and convincing evidence that Gordon was terminated for misconduct in connection with his job. Therefore, we find that the decision of the MESC was arbitrary and capricious, lacking substantial evidentiary anchor.
¶ 21. There was no competent evidence that Gordon was ever told about the prohibition of bringing dirty linen through the clean linen door. The direct evidence offered on this point by the hospital representative, Robin Edwards, was based on her knowledge of a form that had nothing to do with procedures for handling dirty linen. Upkins attempted to fill the gap, but he was not a hospital employee. Moreover, he did not testify as to what Gordon was told about handling dirty linen. He produced a page from the infection control manual which spoke to the procedure for handling dirty linen, but he could only give generic testimony that the manual was "shown to employees in that infection control area." Moreover, Edwards, the hospital's representative, admitted that what Gordon did regarding the movement of the dirty linen would not be grounds for dismissal.
¶ 22. As we have already observed, a statement was made during the investigative stage that cursing results in an automatic dismissal. No such statement or testimony to that effect was given at the hearing which forms the evidentiary record for our review. The record of the investigative interview was not made an exhibit to the hearing.
¶ 23. While the referee found that Gordon "was discharged for violation of company policy and for cursing his supervisor when she confronted him," the record does not support this finding. No one at the hearing testified that Gordon's cursing his supervisor was the reason for his termination, and the employer's witness, Edwards, testified that it was not company policy to terminate an employee for a single act of bringing dirty linen through the clean linen door. The Board of Review of the MESC adopted the findings of fact and *1019 opinion of the referee. Under our standard of review, we are bound by any factual findings of the Board of Review which, in the absence of fraud, are supported by evidence. Miss.Code Ann. § 71-5-531 (Rev.2000). As there was no evidence adduced at the hearing that Gordon was terminated for violating company policy or cursing his supervisor, we are not bound by that finding of the Board of Review.
¶ 24. At the hearing before the referee, the employer had the burden of proving disqualifying misconduct on Gordon's part by substantial, clear, and convincing evidence That did not happen as the only reason given at the hearing for terminating Gordon was that he brought dirty linen through the clean linen door, and, as has already been noted, the employer admitted that that conduct was not grounds for termination.
¶ 25. Even if there had been evidence to support the Board of Review's finding that Gordon was terminated for cursing his supervisor, thereby binding us to accept that fact, we would not find that finding as dispositive of the issue of whether the employer proved by substantial, clear and convincing evidence that Gordon was terminated for disqualifying misconduct.
¶ 26. Again, as we have noted elsewhere in this opinion, the record of the hearing contains not one scintilla of evidence relating to the employer's policy, if indeed it had one, on the consequences of an employee's use of profanity in the workplace, directed to a superior or anyone else. Even if there were, the evidence is clear that this was a single, isolated incident of using profanity. Gordon had no prior incidents. Moreover, while the profanity incident was characterized as an act of insubordination, the record does not clearly support that characterization. It is not clear whether Gordon had already moved the dirty linen through the clean linen door when Edwards confronted him. Based on one portion of Edwards's testimony, one can conclude that he had not already gone through the clean linen door when she confronted him, yet portions of his supervisor's testimony seem to indicate that she confronted him after discovering that he had already moved the dirty linen. However, whether he had or had not done so is not outcome determinative because again, this would be a single incident of insubordination.
¶ 27. We acknowledge that insubordination does fall within the scope of misconduct as it relates to unemployment compensation cases. Insubordination is defined as "a constant or continuing intentional refusal to obey a direct or implied order, reasonable in nature, and given by and with proper authority." Gore v. Miss. Employment Sec. Comm'n, 592 So.2d 1008, 1010 (Miss.1992) (quoting Sims v. Bd. of Trustees, Holly Springs Mun. Separate Sch. Dist., 414 So.2d 431, 435 (Miss. 1982)). "Insubordination may amount to misconduct." Young v. Miss. Employment Sec. Comm'n, 754 So.2d 464, 466(¶ 7) (Miss.1999).
¶ 28. There is no substantial, clear and convincing evidence that Gordon constantly, continually and intentionally disobeyed a direct order from his supervisor. There is evidence that he may have done so on one occasion, but that one occasion does not rise to the level of insubordination as defined in Gore.
¶ 29. We do not question that the employer had a legitimate basis for terminating Gordon, but a termination for cause does not necessarily mandate that unemployment benefits be denied. Misconduct giving rise to a denial of unemployment compensation benefits must meet the requirements of Wheeler.
*1020 ¶ 30. Here, it is undisputed that Gordon had been waiting for approximately thirty minutes for the door to be unlocked so that he could move the dirty linen through the proper door. He testified that he was angry for having to wait so long as he had other work that he needed to get done. Under these circumstances, although it is perhaps understandable why he was miffed, there still was no justification for using profanity toward his supervisor. But by the same token, it is more than a stretch to say that what he did in this one single incident was the equivalent of a "willful and wanton disregard of [his] employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect from his employee." Wheeler, 408 So.2d at 1383.
¶ 31. The dissent cites Mississippi Employment Sec. Commission v. Hudson, 757 So.2d 1010 (Miss.Ct.App.2000) in support of its contention that Gordon's sole, single act of cursing his supervisor rises to the level of a disqualifying act of insubordination and misconduct. With respect, we must say the dissent has misread our holding in Hudson. In Hudson, the employee was denied unemployment benefits "based on her refusal to perform her assigned tasks and for her use of profanity directed towards her team leader and supervisor." Id. at 1012(¶ 6). The employee repeatedly refused to perform her assigned tasks despite the supervisor's attempts to teach her how to perform the tasks. Id. at 1014-15(¶ 12).
¶ 32. For the reasons discussed, we reverse and render the decision of the MESC denying unemployment compensation benefits and the order of the trial court affirming the decision of the MESC and remand this case to the MESC for a determination and an award of benefits.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY IS REVERSED AND RENDERED AND THE CASE IS REMANDED TO THE MISSISSIPPI EMPLOYMENT SECURITY COMMISSION FOR AN AWARD OF BENEFITS.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., THOMAS, MYERS AND CHANDLER, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES AND LEE, JJ.
GRIFFIS, J., Dissenting:
¶ 34. The majority reweighs the evidence and substitutes its judgment for that of the administrative agency, the Mississippi Employment Security Commission ("MESC"). Finding that the decision by the MESC's Board of Review was proper and neither arbitrary nor capricious, I dissent.
¶ 35. The finding of facts by the board of review is to be considered conclusive "if supported by evidence and in the absence of fraud." Miss.Code Ann. § 71-5-531 (Rev.2000). Our review is limited to questions of law. Id. The Mississippi Supreme Court explained this standard of review in Allen v. Mississippi Employment Security Commission, 639 So.2d 904, 906 (Miss. 1994):
This Court's standard of review of an administrative agency's findings and decisions is well established. An agency's conclusions must remain undisturbed unless the agency's order 1) is not supported by substantial evidence, 2) is arbitrary or capricious, 3) is beyond the scope or power granted to the agency, or 4) violates one's constitutional rights. A rebuttable presumption exists in favor of the administrative agency, and the challenging party has the burden of proving otherwise. Lastly, this Court *1021 must not reweigh the facts of the case or insert its judgment for that of the agency.
¶ 36. The board of review determined that Gordon's actions, comments and conduct constituted misconduct. Indeed, Gordon's violation of his employer's instructions and policy appears blatant. Although he may have been angry and miffed, he had no excuse for violating the hospital's policy. The hospital admitted that one incident of moving soiled linen through the clean linen area was not grounds for termination. However, the hospital terminated Gordon for being insubordinate in his response to his supervisor. When he was confronted with his error, Gordon responded with abusive, vulgar and profane language. The board of review found substantial credible evidence to support a conclusion that Gordon made the statement "I'm tired of m_____ f_____ telling me what I can and cannot do. If I want to bring the m_____ f_____ sheets through here, I will." The majority refers to this as simply the profanity incident and concludes that this was not misconduct. We must look at both parts of Gordon's outburst at his supervisor.
¶ 37. First, Gordon's statement that "I'm tired of m_____ f_____ telling me what I can and cannot do" clearly indicated that he neither respected nor intended to follow his employer's instructions and policy. For a hospital, it is extremely important that the instructions and policy be followed, especially in the area of infection control. It was foreseeable that Gordon's actions could cause the spread of infection and lead to the further injury or death of patients.
¶ 38. Second, Gordon's statement to his supervisor that "If I want to bring the m_____ f_____ sheets through here, I will" clearly indicated that he had no intention of following his employer's instruction or policy in the future. This statement can only be characterized as a willful or deliberate refusal to comply with necessary rules and regulations. Indeed, Gordon's statement blatantly indicated his past and future intent to disregard his employer's directives. The potential result was a serious risk to the health of the hospital's patients.
¶ 39. When examined under the definition of misconduct established in Wheeler, Gordon's actions, comments and conduct, clearly constituted "conduct evincing such willful and wanton disregard of the employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect from his employee ... wrongful intent or evil design, and showing an intentional or substantial disregard of the employer's interest or of the employee's duties and obligations to his employer...." Wheeler v. Arriola, 408 So.2d 1381, 1383 (Miss.1982).
¶ 40. Furthermore, insubordination is included in the definition of misconduct. Young v. Miss. Emp. Sec. Comm'n, 754 So.2d 464, 466(¶ 7) (Miss.1999). In Mississippi Employment Security Commission v. Hudson, 757 So.2d 1010, 1012(¶ 3) (Miss. Ct.App.2000), we considered whether vulgar and offensive profanity constituted insubordination. This Court affirmatively answered the "question of whether the uttering of vulgar obscenities by an employee directed at their supervisor rises to the level of a disqualifying act of insubordination and misconduct." Id. at 1014(¶ 12). We reversed the circuit court and reinstated the board of review's decision to deny benefits. Judge Thomas concluded that "[t]he evidence in this case reveals that Hudson's utterings are the result of her displeasure with her supervisor's repeated orders to perform an authorized and reasonable task. We cannot say that such an *1022 incident does not rise to the level of a disqualifying act of insubordination and misconduct." Id.
¶ 41. Unfortunately, profanity in the workplace is all too common. At one time, profanity toward a supervisor, in and of itself, would be sufficient to find an employee insubordinate. However, the standards of our society have been, and by this decision are further lowered to accept or overlook such outbursts of abusive, vulgar and profane language. Hudson stands for the proposition that profanity in the workplace, coupled with other words or actions, can be sufficient to establish misconduct or insubordination. The only distinction is that there was more than one profanity incident in Hudson. Here, while there was only one incident, the words Gordon chose to use along with the profanity clearly expressed that he did not and would not follow his employer's policy.
¶ 42. Gordon's employer chose not to place its patients at risk and terminated Gordon immediately for his misconduct and insubordination. MESC correctly determined that Gordon's actions, comments and conduct constituted misconduct, which disqualified him from unemployment compensation benefits. Certainly, Gordon's response to his supervisor's instruction was insubordinate. Accordingly, I would affirm the decisions of the MESC and the circuit court.
BRIDGES AND LEE, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Childs did not testify at the hearing, and no evidence was offered as to Childs's reason for the termination.