# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CC-01085-COA

**CLARKSDALE PUBLIC UTILITIES COMMISSION**                    **APPELLANT**

**v.**

**MISSISSIPPI DEPARTMENT OF**                    **APPELLEES**
**EMPLOYMENT SECURITY AND MARK P. JOHNSON**

DATE OF JUDGMENT:                09/09/2022
TRIAL JUDGE:                        HON. CHARLES E. WEBSTER
COURT FROM WHICH APPEALED:        COAHOMA COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        DAVID D. O'DONNELL
                                DAVID R. HUNT
ATTORNEYS FOR APPELLEES:        ALBERT B. WHITE
                                MARK P. JOHNSON (PRO SE)
NATURE OF THE CASE:                CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                        AFFIRMED - 02/13/2024
MOTION FOR REHEARING FILED:

     **EN BANC.**

     **McDONALD, J., FOR THE COURT:**

¶1. Clarksdale Public Utilities Commission (CPUC) appeals from the judgment of the Coahoma County Circuit Court that affirmed the order of the Mississippi Department of Employment Security's (MDES) Board of Review, which approved unemployment compensation benefits to Mark Johnson, whose employment at CPUC had been terminated. The MDES Board of Review had affirmed an Administrative Law Judge's (ALJ) finding that Johnson was not disqualified from receiving benefits because of alleged misconduct or insubordination. In its appeal here, CPUC argues (1) that the ALJ refused to admit evidence,

including board minutes, regarding Johnson's insubordination and other acts of misconduct; (2) that the ALJ's award of unemployment benefits to Johnson was arbitrary and capricious;[1] and (3) that collateral estoppel barred the ALJ from reconsidering the factual determination of whether Johnson's actions constituted misconduct. Having considered the arguments of counsel and relevant caselaw, we affirm the circuit court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. Pursuant to Mississippi Code Annotated section 21-27-13 (Rev. 2015),[2] the City of Clarksdale created the Clarksdale Public Utilities Commission (CPUC) to operate the city's public utility. Although CPUC was a separate legal entity, the Commissioners were selected by the City's Board of Alderman.[3] In accordance with its statutory authority, on June 19, 2017, CPUC hired Mark Johnson as the general manager to oversee the day-to-day

---

[1] Encompassed in this argument is CPUC's contention that it had proved by clear and convincing evidence that Johnson engaged in acts of misconduct.

[2] Mississippi Code Annotated section 21-27-13 provides:

The governing authorities of any municipality which now owns and operates, or hereafter shall own and operate, any system or systems shall have the power and authority to create a commission to control, manage and operate such systems, or any one or more of them, which said commission shall consist of not less than three (3) nor more than five (5) commissioners, to be elected by the governing authorities of such municipality. In any municipality operating under the council-manager plan of government, such commissioners shall be selected by, and shall be under the control of, the mayor and councilmen of the municipality, and not the city or town manager . . . .

[3] City authorities can also remove commissioners according to Mississippi Code Annotated section 21-27-15 (Rev. 2015), which provides that "[t]he governing authorities of such municipality shall have the power to remove any member of said commission for inefficiency or incompetency or any other cause."

2

operations of the utility.

###### A. Johnson's Termination

¶3. During the next year, events occurred that caused the Commission to question Johnson's job performance. The Commission engaged an independent investigator, James Herring, to look into a number of matters. As a result of Herring's report and other allegations against Johnson, the Commission suspended Johnson and scheduled a pre-disciplinary hearing. Prior to the hearing, on September 12, 2018, the Commission notified Johnson of five grounds for potential discipline (some of which are repetitive): (1) insubordination based on Johnson's repeated efforts to have the Board of Aldermen remove the Commissioners and reverse his suspension, his failure to cooperate with the independent investigator, his illegal donation of labor and equipment to a local organization contrary to the Commission's instructions, and his release of confidential personnel disciplinary files and information; (2) unauthorized and illegal expenditure of Commission funds for the purchase of a new Interactive Voice Response (IVR) answering system,[4] engagement of an engineering firm to perform GIS mapping services without Commission approval, and the authorization of illegal donations of Wi-Fi boxes to Clarksdale Revitalization Project; (3) harassment and coercion of an employee to file false allegations of sexual harassment against a Commissioner; (4) authorizing and failing to disclose the recording of all CPUC telephone calls on the new IVR system without the knowledge or consent of the participants; and (5)

---

[4] Often called a "touch-tone" system, IVRs are used to direct callers through menu options over the phone. They can also record automated voicemail messages and route calls to departments.

3

inefficient management of the advanced metering infrastructure project which resulted in overtime costs and consumer complaints of billing delays and errors. The letter detailed the policies Johnson allegedly violated.[5]

¶4. The Commission conducted the pre-disciplinary hearing on September 19, 2018, and Johnson was represented by counsel. The Commission made no decision that day, but unanimously decided to reconvene on September 25, 2018. At the reconvened meeting, the Commission voted 4-1 to terminate Johnson. The Commission's decision was based on the following findings: (1) defying the legal authority of the Commission and failure to comply with Commission policies; (2) making inappropriate expenditures; (3) attempting to obtain a sworn statement from an employee concerning sexual harassment that the employee denies occurred; (4) implementing a telephone call recording system that Johnson knew or should have known was illegal; and (5) inefficient management of the advanced metering infrastructure project. The Commission attached to the termination letter a twenty-nine-page summary of its findings and conclusions, which, according to the letter, were the "complete facts leading to [Johnson's] discharge" and contained the documents and/or sworn statements

_____

[5] They include violations of 18 U.S.C. § 2511(1) (anti-wiretapping law); 18 U.S.C. § 4 (reporting law); Mississippi Code Annotated section 31-7-13(b)-(o) (Supp. 2012) (sole-source purchasing law); Mississippi Code Annotated section 21-27-27 (Rev. 2015) (prohibition on municipal authorities from furnishing free services); CPUC's Standard Operating Procedures P-1 (purchasing policies); CPUC's Governance Policy G-9 (Commission-general manager relationship); CPUC's Personnel Policies and Procedures Manual §§ 4.300, et seq. and 16.400, et seq. (general manager's duty to report and investigate sexual harassment allegations of an employee); CPUC's Personnel Policies and Procedures Manual § 13.500, et seq. (failure of general manager to enforce rules); CPUC's Access to Public Records Policy (disclosure of personnel files to the public); and coercion of an employee to make a false allegation.

4

submitted during Johnson's termination hearing. Based on these findings, the Commission terminated Johnson for inefficiency and misconduct. Johnson did not seek judicial review of that decision.

### B. Johnson's Unemployment Benefits Proceedings

#### 1. Application and Initial Determination

¶5. On October 10, 2018, Johnson applied for unemployment benefits with the Mississippi Department of Employment Security (MDES). When notified, CPUC responded that Johnson was disqualified from receiving benefits because of misconduct. On October 30, 2018, an MDES claims examiner awarded Johnson benefits, finding that the CPUC had not proved that Johnson was discharged for misconduct connected with work. CPUC appealed the decision of the claims examiner on November 5, 2018. After twice being rescheduled, on January 30, 2019, the ALJ conducted a hearing de novo on CPUC's appeal. The issue was whether, as CPUC claimed, Johnson was disqualified from receiving benefits because he was terminated for misconduct.

¶6. Prior to the hearing, CPUC filed a brief in opposition to Johnson's claim, arguing that collateral estoppel applied to the MDES proceeding and that because the Commission had already determined that Johnson was guilty of misconduct, MDES was bound by that finding. CPUC attached Exhibits A through F, consisting of (A) the notice of the pre-disciplinary hearing, (B) the minutes from the September 19 pre-disciplinary hearing, (C) the documents and evidence received and considered at the September 19 pre-disciplinary hearing; (D) the minutes from the September 25 disciplinary hearing, (E) the Commission's written findings

5

of fact and conclusions regarding Johnson's termination, and (F) the notice to Johnson of his discharge and the reasons for his termination. Altogether, these exhibits made up over 900 pages.

¶7. Johnson filed a response brief on January 23, 2019. In it, Johnson cited *Mississippi Employment Security Commission v. Philadelphia Municipal Separate School District of Neshoba County*, 437 So. 2d 388 (Miss. 1983), in which the Mississippi Supreme Court found that MDES was *not* collaterally estopped by previous findings of the school board. *Id*. at 396. On January 25, 2019, CPUC replied to Johnson's brief, distinguishing the Philadelphia school case from Johnson's case.

¶8. Johnson also requested that the ALJ subpoena CPUC Commissioners Mitchell, Davis, Hicks, and Humber to attend the hearing. CPUC moved to quash the subpoenas, arguing that Johnson failed to show any necessity in subpoenaing the Commissioners. Ultimately, the ALJ denied CPUC's motion and required all five Commissioners to be present for the January 30 hearing.

### 2. *January 30, 2019 ALJ Hearing*

¶9. At the ALJ hearing on January 30, 2019, before presenting any testimony, CPUC sought to enter Exhibits A through F. Although CPUC's counsel identified each exhibit, counsel did not provide an explanation of what each document contained and what it was being offered to prove. The ALJ refused to blanketly admit the exhibits because CPUC had failed to show how each was relevant to the proceedings. Rather, the ALJ stated that it would admit specific individual exhibits if there was testimony from the witnesses during the

hearing providing a foundation for the document's relevance.

<u>Testimony of Former CPUC Chair Freddie Davis</u>

¶10.     The hearing proceeded with witness testimony, beginning with former Commission chair Freddie Davis. Davis testified that he served on the Commission from April 2014 until October 2018. He stated that he was representing the CPUC at the hearing, and the ALJ referred to him as the employer representative for CPUC. During Davis's testimony, CPUC sought to admit only two of Exhibits A through F, including Exhibit E (the Commission's twenty-nine-page "Findings of Fact and Conclusions Re: General Manager Mark Johnson's Actions and Conduct Meriting Discipline"). Davis confirmed that the Commission had adopted these findings, which detail a chronology of events gleaned from emails, documents presented at board meetings, and other sources into the Commission's minutes during its September 25, 2018 hearing when the Commission terminated Johnson for cause. Over Johnson's objection, the ALJ admitted Exhibit E.

¶11.     The only other exhibit CPUC attempted to admit was an invoice that it claimed proved Johnson made a single-source purchase of the IVR system without the approval of the Commission. CPUC policies required that any purchase over $5,000 must either (1) be submitted to multiple vendors to bid on or, if no other vendors can be found, (2) be approved by the Commission as a single-source purchase. Davis testified that Johnson did neither when the IVR system was purchased. To show that Johnson could have found other vendors to bid on the system, CPUC presented a quote that CPUC had obtained from a local vendor on August 28, 2018, for a similar IVR system. Johnson objected to the admission of the

quote, arguing that this bid was secured after Johnson's July 25 suspension in order to fabricate a reason for terminating him. Johnson further argued that Davis could not authenticate the bid because it was solicited by CPUC's accounting department, not Davis. CPUC responded that regardless of when the bid was obtained, Johnson failed to submit the IVR purchase to the Commission for approval under the single-source exception. Ultimately, the ALJ refused to admit the document, finding that it was not relevant and that CPUC failed to establish its authenticity.

¶12.   Significantly, after the admission of Exhibit E and the rejection of the August 28 IVR quote, CPUC made no other attempt to enter any other exhibits into evidence or make a proffer. However, Davis continued to testify about the reasons for Johnson's termination.

*Single-source Policy Violation*

¶13.   Although the ALJ did not admit the August 28, 2018 invoice, Davis testified that Johnson violated Commission policy by purchasing the IVR system from a single source without the Commission's permission.

*Recording of Telephone Calls*

¶14.   According to Exhibit E, the Commission learned in June 2018 that telephone calls on all CPUC lines were being recorded without participants' knowledge or consent. They were concerned because the issue of recording calls had been raised ten years earlier and, to avoid any violation of federal law,[6] the Commission set a policy that only customer calls were to

---

[6] 18 U.S.C. § 2511(1) and (4)(a) provide:

(1) Except as otherwise specifically provided in this chapter any person who--
    (a) intentionally intercepts, endeavors to intercept, or procures

8

be recorded and then with the knowledge or consent of participants on the call. The Commission instructed Johnson to determine who had authorized these current recordings. The Commission also instructed its counsel to report the matter to the Federal Bureau of Investigation (FBI) because the attorney had advised them that even knowledge of the

> any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when--
>
>> (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
>>
>> (ii) such device transmits communications by radio, or interferes with the transmission of such communication; or
>>
>> (iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or
>>
>> (iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or
>>
>> (v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;
>> . . . .
>
> shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

> (4)(a) Except as provided in paragraph (b) of this subsection or in subsection (5), whoever violates subsection (1) of this section shall be fined under this title or imprisoned not more than five years, or both.

interception of telephone conversations was a federal crime,[7] and that anybody having actual knowledge of the crime must report it to the appropriate federal authority as soon as possible. The CPUC attorney reported the situation to the FBI on June 21, 2018. Davis testified that, ultimately, the Commission engaged James Herring to conduct an independent investigation of this and other matters.

¶15. Davis stated that Johnson requested permission from the Commission to report the recording matter to the State Auditor and the Mississippi Attorney General's office. Davis admitted that they had initially told Johnson not to report the matter to these state agencies because the Commission had already hired an independent investigator. However, Exhibit E, the Commission's findings, reflects that after a joint meeting between the Commission and the Clarksdale Board of Aldermen, the state agencies were notified.

*Wi-Fi Devices for Clarksdale Revitalization Project*

¶16. Davis then testified that Johnson allowed Wi-Fi devices to be attached to CPUC's utility poles on behalf of the Clarksdale Revitalization Project,[8] which was done without the approval of the Commission. Davis said that this violated CPUC policy that required

---

[7] 18 U.S.C. § 4 states:

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

[8] Davis said that the Wi-Fi devices installed on the utility poles were requested by the Clarksdale Revitalization Project, which sought to beautify and update the Clarksdale downtown to attract industry. Davis could not explain the Revitalization Project's funding, but he did say he believed the City of Clarksdale was its primary source of funds.

10

payment of a fee for any attachment to a utility pole, which Johnson did not collect. Davis said that the Attorney General had issued an opinion to another entity that prohibited municipal authorities from providing such free service because doing so would constitute an illegal donation to a private entity. Davis testified that this failure of Johnson was one of the facts adopted by the Commission in its findings during its September 25 hearing.

*False Allegations of Sexual Harassment*

¶17. Davis further testified that after learning that the telephone-recording issue had been reported to the FBI, Johnson sent an email to the Commissioners claiming that he had received a notarized statement from a CPUC employee detailing sexual harassment and verbal abuse by a Commissioner. The Commission later determined that Johnson, in fact, had pressured the employee, Sheila Profit, to falsely accuse the Commissioner named. This presentation of a false accusation against a Commissioner was an additional ground for Johnson's termination.

*Release of Information from Personnel Files*

¶18. According to the Commission's findings in Exhibit E, Johnson cautioned the Commission against reporting the telephone-call recording issue to the FBI because Johnson felt that the FBI's investigation may reveal a recording that had led to the forced resignation of a Commissioner and a CPUC employee. However, the Board's attorney informed Johnson that both individuals in that case knew they were being recorded. Moreover, the CPUC attorney cautioned that this information was part of a disciplinary hearing that was privileged, confidential, and should not be released. Later, Johnson forwarded to the Commission an

11

email he had received from Paul Wilson of WROX (a local radio station) in which Wilson said he planned to reveal "the whistleblower report" (i.e., the report to the FBI of unauthorized phone call recording) and "activities of [Commissioners] Bo Plunk and George Davis relative to CPU workers and potential employees." Based on this email, Davis testified that Johnson had released confidential information from employees' personnel files to a local radio station in violation of CPUC policies.

*Other Acts of Insubordination*

¶19. Davis testified that Johnson was insubordinate when he initially refused to be interviewed by the independent investigator. According to Exhibit E, Johnson was scheduled to be interviewed by Herring on the same day that Johnson met with the mayor and requested that the Board of Aldermen remove all of the Commissioners. According to Davis, both Johnson's failure to attend the interview and his reports to the mayor and Board of Aldermen constituted insubordination. However, Exhibit E's findings noted that Johnson did eventually comply and was interviewed by Herring.

Testimony of Sheila Profit

¶20. Sheila Profit testified about Johnson's coercion of her to file sexual harassment charges. Profit was the senior accountant for CPUC, and Johnson was her immediate supervisor. Profit said that she filed a grievance with the human resources department on July 24, 2018, because she was being pestered and bothered by Johnson. She said that he was asking her to file a report of sexual harassment by a Commissioner with the city whistleblower program. She said she had understood there was tension brewing between the

Commission and Johnson, and that she didn't want to be involved in it. Profit said she never signed a notarized affidavit claiming sexual harassment, and that Johnson's claim that she had was false.

¶21. Profit explained the genesis of the issue. She said she had shown Johnson a series of threatening text messages she had received from some CPUC-assigned phone number. She was trying to determine from Johnson the name of the person who was assigned that number so she could identify who sent her the texts. Profit testified that the person identified was another CPUC employee who had been terminated. The offending employee appealed his termination but ultimately resigned. Profit stated it was her understanding that this terminated employee told Johnson that she (Profit) had been sexually harassed by a commissioner, which, Profit reasoned, was why Johnson felt that she needed to file a sexual harassment claim against the commissioner. But Profit said she had not been sexually harassed—only pressured by Johnson to file a claim that was not true.

## Testimony of Mark Johnson

¶22. Johnson testified that he was provided a letter giving him the reasons for his termination. The letter said that he was terminated for (1) installation of a recording system, (2) inappropriate expenditures, (3) insubordination by attempting to thwart an investigation, (4) coercion of a false statement by an employee, and (5) inefficient handling of a project. He said that prior to being suspended, he had not been told he had violated any policies.

### Recording of CPUC Telephone Calls

¶23. Concerning the IVR recording system, Johnson said that no proof was produced that

13

any individual calls were actually recorded—just that a recording system was installed. When asked by the Commission about the recording equipment and who approved its installation, he told the Commission that he had spoken with CPUC administrators Liz Haynes, Steve Reed, and Brandon Soldevila, who all said that Jim Hemphill had approved the installation.[9] Johnson also said it was his understanding that the CPUC attorney was pursuing federal wiretapping charges against him personally.

*Violation of Single Source Purchase Policy*

¶24. Johnson said that he did not violate the single-source purchase policy. He said that he informed the Commission of the single-source purchase of the IVR system, which the Commission approved but neglected to record in its minutes. He said that preparing the minutes was the Commission's responsibility and that he should not be held responsible for its neglect to include this approval in the minutes.

*Installation of Wi-Fi Devices*

¶25. Concerning the installation of Wi-Fi devices on utility poles for the Clarksdale Revitalization Project, Johnson said that he received the request from the mayor, not the Clarksdale Revitalization Project. Johnson said he directed the mayor to fill out the appropriate form, which the mayor did. He emphasized that the City of Clarksdale "owns" CPUC and that they generally cooperate and share equipment with each other. He said he

---

[9] Exhibit E (the Commission's findings) contradicts Johnson's testimony. The findings refer to a Commission meeting on June 24, 2018, where the Commissioners questioned Haynes about Hemphill's authorization of recording calls. Haynes told the Commissioners that Hemphill had not told her this directly, but Soldevila had told her Hemphill said this. Thereafter, two commissioners met with Soldevila in a private meeting who denied telling anyone that Hemphill had said he had approved the recording of calls.

had never been told that installing the Wi-Fi devices was improper and he thought that it was because CPUC had developed specific forms for sharing equipment with the city.

*Release of Information from Personnel Files*

¶26. Johnson said that he never released any CPUC personnel files to the public or elsewhere. He said he left all personnel files on his desk when he was suspended. Johnson emphatically denied turning any information over to WROX (the radio station) without approval by the Commission.

*Insubordination*

¶27. Johnson admitted that he requested that the Board of Aldermen investigate and remove the Commissioners. The CPUC findings contained in Exhibit E reflect that Johnson sent numerous emails to the Commission with copies to the Commission attorney, alleging wrongdoing and misconduct by the Commissioners and others, such as (1) paying back favors with CPUC jobs; (2) reversing termination or suspensions for friends and relatives at the expense of CPUC; (3) causing others to be indebted to them by providing a job or favorable treatment at the expense of CPUC; (4) hiring or promoting a person in CPUC to further the Commissioners personal or political agenda, and their "need for organizational control, power, and information at the expense of CPUC"; (5) participating in inappropriate subordinate/superior discussions and activities; and (6) violating CPUC policies. In Johnson's email, he told the Commissioners that these activities were ongoing, needed to stop immediately, and would not go "unchecked" by him.

¶28. Johnson testified that he was called to the mayor's office six days after he was

suspended and asked to turn over any information regarding illegal or unethical conduct by the Commission. Johnson testified that he did this and requested that the Board reinstate him, Steve Reed, and Chris Campos (both of whom had also been suspended). Johnson maintained, in his opinion, that reporting commissioner irregularities was not insubordination because his position required him to report the illegal and unethical conduct he had witnessed at the Commission not only to the CPUC but also to the "highest authority" over the CPUC, the Board of Aldermen.[10]

### Pressuring Profit to Submit a False Accusation of Sexual Harassment

¶29. In response to Profit's testimony, Johnson said that she had approached him about wanting to go forward with a claim of sexual harassment, but later, she changed her mind. Johnson said he told her that if she did not report the harassment, he may have to report it to the State Auditor himself for their investigation into abuse by public officials. When Profit said she still did not want to pursue the claim in late July, Johnson said he accepted her refusal to press the claim. He said that both times she came to him, he had two witnesses in the office. He also said that when she came to the office to originally tell him about the harassment, she had a notarized letter showing the harassment. He denied badgering Profit in any way.

### Other Miscellaneous Matters

¶30. Regarding inefficient handling of projects, Johnson said that there were never any

---

[10] The CPUC's findings (Exhibit E) reflect that after reviewing whatever Johnson submitted, the mayor and Board of Aldermen took no action.

16

complaints about the services provided by CPUC until after he, Steve Reed, and Chris Campos were suspended. He said that immediately after they were suspended, as many as twenty people appeared at Commission meetings to lodge complaints. This, Johnson said, would not have occurred had he not been suspended. In essence, the suspension caused the inefficiency, not the other way around.

Closing Arguments

¶31. At the conclusion of testimony, the ALJ confirmed that the only document admitted into evidence was Exhibit E (the Commission's findings). CPUC made no other attempt to offer exhibits into evidence or make a proffer of anything it contended was improperly excluded.

¶32. In closing, CPUC argued it had met its burden of proving misconduct. It argued that Johnson violated CPUC policy by approving purchases and granting favors to the Clarksdale Revitalization Project, coercing Sheila Profit into making a falsified harassment claim against a commissioner, approving the installation of illegal recording equipment, and insubordination by attempting to thwart the CPUC's investigation into personnel matters.

¶33. Johnson argued that CPUC had not proved any misconduct. Instead, he argued that the evidence showed that CPUC had terminated him because he had challenged a number of CPUC's practices. Johnson also argued that the Commission terminated him because he had been pressuring them to report the recording equipment issue to the State Auditor and Attorney General and because of his cooperation with the mayor and the Board of Aldermen.

     *3.    ALJ Decision*

¶34. On February 6, 2019, the ALJ issued her decision. The ALJ cited Mississippi Code Annotated section 71-5-513(A)(1)(b) (Supp. 2012), which stated that an individual shall be disqualified for benefits if he was discharged for misconduct connected with his work. The ALJ noted that in cases of an employee's termination, the burden of proving such misconduct is on the employer. The ALJ defined misconduct based on *Wheeler v. Arriola*, 408 So. 2d 1381, 1383 (Miss. 1982), which stated:

> [T]he meaning of the term "misconduct," as used in [Wisconsin's] unemployment compensation statute, was conduct evincing such willful and wanton disregard of the employer's interest as is found in deliberate violations or disregard of the standards of behavior which the employer has the right to expect from his employee. Also, carelessness and negligence of such degree, or recurrence thereof, as to manifest culpability, wrongful intent or evil design, and showing an intentional or substantial disregard of the employer's interest or of the employee's duties and obligations to his employer, came within the term. Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, or inadvertencies and ordinary negligence in isolated incidents, and good faith errors in judgment or discretion were not considered "misconduct" within the meaning of the statute.

Further, the ALJ cited MDES Regulation 308.00, which states that misconduct shall be defined as, but not limited to, (1) failure to obey orders, rules or instructions, or failure to discharge the duties for which an individual was employed; (2) substantial disregard for the employer's interests or of the employee's duties and obligations to the employer; (3) conduct that shows intentional disregard—or utter indifference—of an employer's interests as is found in deliberate violations or disregard of standards of behavior the employer has the right to expect of the employee; or (4) carelessness or negligence of such degree or recurrence as to demonstrate wrongful intent.

¶35. The ALJ found that the evidence presented did not establish that Johnson intentionally

18

circumvented or violated the policies and procedures of CPUC and that the evidence did not show Johnson directed the telephone lines to be recorded or that he intentionally withheld information regarding the telephone lines being recorded. The ALJ stated that much of the evidence reflected poor judgment on Johnson's part. The ALJ concluded that

> in light of the employer's allegations of possible criminal wrongdoing, . . . the employer was within its rights to terminate the claimant's services for any reason that it deems necessary; however, misconduct connected with the work has not been established.[11]

Based on these considerations, the ALJ found that CPUC had not sufficiently proved misconduct.

### 4. Appeal to the MDES Board of Review

¶36. Following the ALJ's decision, CPUC requested review by the MDES Board of Review. Among other things, CPUC asked the Board to review the other 900-plus pages of exhibits that had not been entered in the record at the ALJ hearing. The Board made no ruling on CPUC's request concerning the additional exhibits and, based on a review of the administrative record, the Board affirmed the ALJ's decision on February 26, 2019.

### C. Appeal to the Circuit Court

¶37. CPUC appealed the Board of Review decision to the Coahoma County Circuit Court on March 13, 2019. In its petition for review, CPUC argued that CPUC, a municipal agency of the City of Clarksdale, Mississippi, may only discharge an employee who is "found inefficient or for other good cause." Based on State law, CPUC had conducted a due process

---

[11] The ALJ decision did not address Sheila Profit's testimony, the claim of releasing CPUC personnel records, or the approval of funds for the Clarksdale Revitalization Project.

hearing to ensure that it complied with the "good cause" requirement before terminating Johnson from employment with CPUC. Thus, CPUC concluded, MDES was estopped from relitigating the fact issue of his misconduct. CPUC also argued that the ALJ erred by refusing to admit exhibits A, B, C, D, and F and only admitting Exhibit E (the Commission's findings of facts and conclusions regarding General Manager Mark Johnson's actions and conduct meriting discipline). CPUC also argued that the ALJ erred in requiring the testimony of Commissioner Davis, based on the reasoning that a single Commissioner is not entitled to speak for the Commission and that the Commission's minutes are the only proper method of evaluating what the Commission knew or considered. Lastly, CPUC argued that the ALJ's decision was arbitrary, capricious, unsupported by substantial evidence, and contrary to the overwhelming weight of the evidence.

¶38. CPUC also moved the circuit court to supplement the record to include the 900-plus pages of exhibits that the ALJ did not admit. The circuit court granted this motion.

*Circuit Court Judgment*

¶39. The circuit court entered its judgment on CPUC's appeal on September 9, 2022. In its judgment, the court held the following.

(1) Collateral Estoppel

¶40. The circuit court found that the procedural history in the present case was almost identical to that in *Mississippi Employment Security Commission v. Philadelphia Municipal Separate School District*, 437 So. 2d 388 (Miss. 1983). In particular, in *Philadelphia*, the supreme court stated:

> The fact inquiries necessarily before the School Board, on the one hand, and the MESC, on the other hand, are, as a matter of law, different. . . . Second, and more fundamental, the doctrine of collateral estoppel must never be seen as anything other than an unusual exception to the general rule that all fact questions should be litigated fully in each case. . . .This is not to say that the proceedings before the School Board are wholly irrelevant. The findings of fact made by the School Board were received by the Appeals Referee and considered as evidence, though not preclusive evidence. This course of proceeding is correct.

*Id*. at 396-98. Based on this case, the court found that the Commission's "due process" hearing, while not wholly irrelevant, did not preclude the ALJ's findings concerning misconduct because the CPUC's analysis of "good cause" required for termination under its enabling statute is entirely distinct from an analysis of those actions as "misconduct" under MDES statutes and regulations.

¶41. In reaching this conclusion, the circuit court analyzed the particular language in Mississippi Code Annotated section 21-27-17 (Rev. 2015), which states, "[CPUC] shall have the right to discharge employees when found *inefficient or for other good cause.*" (Emphasis added). Because the statute cites inefficiency as one type of good cause, the court determined that CPUC's "good cause" is entirely different from MDES's misconduct. This is because "[m]ere inefficiency . . . [is] not considered 'misconduct' within the meaning of the [MDES]statute." *Wheeler*, 408 So. 2d at 1383. Therefore, MDES's test for unemployment benefits is different from CPUC's test for termination. Thus MDES is not collaterally estopped from evaluating Johnson's claim and any disqualification due to misconduct.

(2) ALJ's Refusal to Admit CPUC exhibits

21

¶42. To determine whether the ALJ abused its discretion in denying the admission of the CPUC exhibits, the circuit court applied the rationale in *Dailey v. MDES*, 271 So. 3d 715 (Miss. Ct. App. 2018), which held that "formal rules of practice, procedure, and evidence are more relaxed in proceedings before administrative agencies than in courts of law [, but] ideas of fundamental fairness should prevail." *Id*. at 718 (¶12) (citation omitted). Further, as a practical matter, *Dailey* said the ALJ must have "some discretion to control the presentation of evidence." *Id*. Lastly, because the appellant's "assertion had been competently made with other evidence[,]" the ALJ's reasoning in refusing to admit official minutes was not an abuse of discretion. Because CPUC was able to competently assert its arguments without the admission of the voluminous 900-plus pages of minutes, emails, and CPUC files, the circuit court held that the ALJ had the authority to limit CPUC's exhibits to only those necessary to support its argument (namely Exhibit E, the Commission's findings). Moreover, the circuit court stated that it had reviewed the entire 900 or more pages of supplemental record, "*a time-consuming procedure*," and had determined that the Commission's findings were an adequate summary of the exhibits that CPUC had sought to admit.

(3) Proof of Misconduct by Clear and Convincing Evidence

¶43. In its opinion affirming the findings of the MDES ALJ, the circuit court addressed each of CPUC's arguments concerning its proof of misconduct. The circuit court held that because Johnson provided credible and persuasive testimony challenging CPUC's reasons for his termination, the ALJ was correct in finding that CPUC did not prove misconduct by

clear and convincing evidence. The circuit court emphasized that "[it] must not reweigh the facts of the case or insert its judgment for that of the agency." *Allen v. Miss. Emp. Sec. Comm'n*, 639 So. 2d 904, 906 (Miss. 1994). The ALJ concluded that Johnson acted on information that he deemed reliable concerning the allegation of sexual harassment, testifying that Profit showed him a notarized document alleging sexual harassment. The court noted that, in sitting as a reviewing, intermediate appellate court, it should defer to the findings of the ALJ in issues involving credibility of witnesses.

¶44. On the telephone-recording issue, the court cited the ALJ's decision that "[t]he evidence does not show that [Johnson] directed that all telephone lines be recorded or that he intentionally withheld information regarding said recording from the employer." Johnson testified that he did not direct the phone calls to be recorded, and that he reported to the Commission that Hemphill had ordered the installation and recording of phone lines. For the same reasons as stated above, the circuit court found that the ALJ's weighing of the evidence should not be disturbed.

¶45. Concerning the allegations of Johnson's alleged disclosure of confidential information, the court found that CPUC's brief lacked any authority or citations to the record to support this claim, and thus found it had been waived. Lastly, regarding Johnson's termination for inefficiency, the circuit court found that based on MDES's standard for misconduct, "mere inefficiency" cannot sustain a finding of misconduct. Thus, the circuit court concluded that the ALJ was correct in not considering CPUC's arguments surrounding this issue. *See Wheeler*, 408 So. 2d at 1383-84.

### D.    Current Appeal

¶46.    On October 10, 2022, CPUC filed its notice of appeal from the circuit court's judgment. In its brief, CPUC raises the following issues: (1) whether MDES was collaterally estopped from considering Johnson's claim because CPUC had already conducted a due process hearing and adjudicated the fact that Johnson had committed misconduct; (2) whether the ALJ erred in denying the admission of the Commission's full set of exhibits; and (3) whether the Commission proved misconduct by clear and convincing evidence.

### STANDARD OF REVIEW

¶47.    Whether a matter is barred by res judicata or collateral estoppel is a question of law and is thus reviewed de novo. *Claiborne v. Ocwen Loan Serv. LLC*, 194 So. 3d 877, 880 (¶9) (Miss. Ct. App. 2015) (quoting *Baker & McKenzie LLP v. Evans* 123 So. 3d 387, 401 (¶49) (Miss. 2013)).

¶48.    Mississippi Code Annotated section 71-5-531 (Supp. 2019) sets out the standard of review of a decision of the MDES Board of Review:

> In any judicial proceedings under this section, the findings of the Board of Review as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law.

"An agency's conclusions must remain undisturbed unless the agency's order: (1) is not supported by substantial evidence, (2) is arbitrary or capricious, (3) is beyond the scope or power granted to the agency, or (4) violates a statutory or constitutional right of the complaining party." *Grace v. Miss. Dep't of Emp. Sec.*, 328 So. 3d 1267, 1269-70 (¶7) (Miss. Ct. App. 2021).

24

¶49.    "When an appellate court reviews a trial court's decision to affirm or deny an administrative agency's findings and decisions, the appropriate standard of review is abuse of discretion." *Vector Transp. Co. v. Miss. Dep't of Emp. Sec.*, 350 So. 3d 289, 293 (¶9) (Miss. Ct. App. 2022) (quoting *McGee v. Miss. Emp. Sec. Comm'n*, 876 So. 2d 425, 427 (¶5) (Miss. Ct. App. 2004)).  We should only find that the circuit court abused its discretion if we have a "definite and firm conviction" that the circuit court committed a "clear error of judgment" in reaching its conclusion after weighing any relevant factors.  *McCord v. Healthcare Recoveries Inc.*, 960 So. 2d 399, 405 (¶13) (Miss. 2007) (citing *Ill. Cent. R.R. v. McDaniel*, 951 So. 2d 526 (Miss. 2006)).

## DISCUSSION[12]

### I.    Whether collateral estoppel barred the ALJ from deciding whether Johnson was guilty of disqualifying misconduct.

¶50.    CPUC argues that because it made a factual determination that Johnson should be terminated for good cause as required under Mississippi Code Annotated section 21-27-17,[13] the MDES was collaterally estopped from making a separate factual determination of Johnson's misconduct.  In other words, CPUC claims that its findings supporting Johnson's

---

[12]    Before the Supreme Court assigned this appeal to this Court, Johnson filed a pro se motion to dismiss CPUC's appeal because opposing counsel allegedly breached the Mississippi Rules of Professional Conduct.  Johnson also claimed that CPUC's appeal is frivolous. A three-justice panel entered an order passing Johnson's motion for consideration with the merits of the appeal.  Johnson subsequently filed another motion to dismiss and alleged that opposing counsel "repeatedly failed to comply substantially with the Mississippi Rules of Professional Conduct." Johnson's second motion has been treated as an attachment to his first motion.  After due consideration, both motions are denied.

[13]    "[CPUC] shall have the right to discharge employees when found inefficient or for other good cause."

termination established "misconduct" precluded any new examination by MDES.

¶51. The Mississippi Supreme Court has defined collateral estoppel as follows:

> The doctrine of collateral estoppel—often considered a cousin of res judicata—serves a dual purpose and protects litigants from the burden of re-litigating an identical issue with the same party or his privy and promotes judicial economy by preventing needless litigation. Collateral estoppel is an unusual exception to the general rule that all fact questions should be litigated fully in each case. Collateral estoppel precludes relitigating a specific issue, which was: (1) actually litigated in the former action; (2) determined by the former action; and (3) essential to the judgment in the former action.

*Gibson v. Williams, Williams & Montgomery P.A.*, 186 So. 3d 836, 845 (¶21) (Miss. 2016) (internal quotation marks omitted). Therefore, we must look to see if a specific issue being raised now was addressed and ruled upon in the prior case. *Baker*, 123 So. 3d at 402 (¶49).

¶52. Interestingly, both CPUC and MDES cite *Philadelphia* as authority that supports their distinctly different positions. In *Philadelphia*, the supreme court addressed the issue of whether a school board's finding of misconduct collaterally estopped the Mississippi Employment Security Commission (MESC)[14] from making its own factual determination of whether a teacher had committed employee misconduct. *Philadelphia*, 437 So. 2d at 390. In that case, the board held a non-renewal hearing of a teacher pursuant to the provisions of the Education Employment Procedures Law of 2001. *Id.* Following this hearing, the board made specific, detailed findings that the teacher was incompetent and unfit and that "good cause" existed for his non-reemployment with the school district. *Id.* at 390-92. The teacher in that case challenged this finding in the Chancery Court of Neshoba County, which

---

[14] This Court takes judicial notice of the fact that the MESC has since been replaced with the Mississippi Department of Employment Security.

affirmed the findings of the board. *Id.* at 392. The teacher then filed for unemployment benefits with the MESC. *Id.* At a hearing before a MESC Appeals Referee, the referee found that the teacher was entitled to unemployment benefits. *Id.* The school district appealed this decision to the Circuit Court of Neshoba County, which reversed the MESC referee's decision, finding that MESC was collaterally estopped from considering the claim. *Id.* MESC then appealed the circuit court's decision to the Mississippi Supreme Court. *Id.*

¶53. The supreme court analyzed the differences between the school board's definition of misconduct and MESC's definition of misconduct to determine whether the finding of misconduct by the school board was essential to the board's judgment. *Id.* at 396. In doing so, the Supreme Court held that although the fact questions litigated before the school board were the same as the fact questions decided by the MESC, "*beyond that, however, we hold that those fact findings were not 'essential to the judgment' in the PMSSD teacher non-reemployment proceedings.*" *Id.*

> The fact inquiries necessarily before the school board, on the one hand, and MESC, on the other hand, are as, a matter of law, different. In school teacher non-reemployment proceedings, good cause is essentially an irrelevant concept. The school administration is not required to demonstrate good cause for its decision that a particular school teacher will not be reemployed. *Calhoun County Board of Education v. Hamblin*, 360 So. 2d 1236, 1239-1240 (Miss. 1978). On the other hand, good cause amounting to willful misconduct is required before an employee may be disqualified for unemployment compensation benefits. *See Wheeler v. Arriola*, 408 So. 2d 1381, 1383 (Miss. 1982) . . . .

*Id.* Although the board had found the teacher's contract should not be renewed "for good cause," such a finding was not necessary as a matter of law because, under the at-will employment doctrine of Mississippi, school administrators may refuse to rehire a teacher for

27

"good reason, for bad reason, or for no reason at all." *Id.* at 397. "The administration simply may not base its decision not to rehire upon legally impermissible considerations." *Id.* (citing *Hamblin*, 360 So. 2d at 1239). Because the determination that the teacher was not being rehired for misconduct was not essential to board's decision, the supreme court found that MESC was not collaterally estopped from considering whether misconduct actually occurred. *Id.*

¶54. We find *Philadelphia* supports Johnson's position in the present case. CPUC terminated Johnson after a lengthy investigation and a series of hearings. At the close of its investigation and hearings, CPUC determined that Johnson had committed various acts of insubordination, policy violations, statutory violations, and misconduct. However, CPUC's enabling statute states "[CPUC] shall have the right to discharge employees when found *inefficient* **or** *for other good cause*." Miss. Code Ann. § 21-27-17 (emphasis added). As the circuit court stated in its final judgment, "[i]n other words, according to this definition, inefficiency represents one type of good cause or, as CPUC might argue - inefficiency equates to misconduct." But MDES's standard for misconduct differs from that found in CPUC's governing statutes. Regulations define misconduct for the purposes of determining if a claimant is disqualified from receiving unemployment benefits:

> A. For purposes of Mississippi Code Section 71-5-513, misconduct shall be defined as including but not limited to:
> > 1. The failure to obey orders, rules or instructions, or failure to discharge the duties for which an individual was employed;
> > > a. An individual shall be found guilty of employee misconduct for the violation of an employer rule only under the following conditions:
> > > > i. the employee knew or should have known of the

28

rule;

      ii. the rule was lawful and reasonably related to the job environment and performance; and

      iii. the rule is fairly and consistently enforced.

2. A substantial disregard of the employer's interests or of the employee's duties and obligations to the employer;

3. Conduct which shows intentional disregard -- or if not intentional disregard, utter indifference - of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of the employee; or

4. Carelessness or negligence of such degree or recurrence as to demonstrate wrongful intent.

However, *mere inefficiency*, unsatisfactory conduct, failure to perform as the result of inability or incapacity, a good faith error in judgment or discretion, or conduct mandated by a religious belief or the law is not misconduct. Conduct mandated by the law does not include court ordered conduct resulting from claimant's illegal activity; this may be considered misconduct.

20 Miss. Admin. Code Pt. 101, R. 308.00 (emphasis added). The Mississippi Supreme Court

reiterated in *Wheeler*, 408 So. 2d at 1383, "*Mere inefficiency* . . . [is] not considered

'misconduct' within the meaning of [relevant Mississippi statutory law]." (Emphasis added).

Thus, MDES requires employers to show a higher degree of misconduct to consider an

employee ineligible for unemployment benefits than CPUC. Therefore, because the factual

and legal considerations of MDES are different from those considered by CPUC, collateral

estoppel does not apply.

¶55. Further, the court in *Philadelphia* also pointed out the disconcerting consequence that

may arise were we to allow municipal agencies to make findings of fact that precluded

MDES from granting unemployment benefits. The supreme court stated:

[A municipal agency] will always be tempted, out of its own self-interest and in anticipation of unemployment compensation reimbursement proceedings, to tailor its findings of fact so as to preclude [MDES's] access to the [city's]

29

treasury for reimbursement of the Employment Security Trust Fund.

*Philadelphia*, 437 So. 2d at 397. If we allowed a municipal agency to collaterally estop MDES from considering whether an employee had committed misconduct, then we would be allowing Commissioners to be both a party and the judge in their own proceedings. This clearly would violate norms of justice and due process.

¶56. Accordingly, we find that MDES was not collaterally estopped from making a factual determination on whether Johnson committed misconduct that made him ineligible for unemployment benefits.

**II.      Whether the MDES ALJ erred in denying the blanket admission of CPUC's 900-plus pages of exhibits.**

¶57. Of CPUC's 900-plus pages of exhibits, the ALJ admitted one, Exhibit E, a twenty-nine-page summary of the rest and refused to admit the only other individual exhibit CPUC offered. On appeal, CPUC argues that the other exhibits, many of which were board minutes, should have been admitted when it initially sought to enter them because "a board speaks only through its minutes." CPUC also argues that the ALJ abused its discretion in failing to blanketly admit the other exhibits that it contends it had "proffered." To resolve this issue, we first look at what exhibits CPUC actually offered, and whether it made a proper proffer of the others.

*Insufficient Proffer*

¶58. Rule 103 of the Mississippi Rules of Evidence states:

(a) Preserving a Claim of Error. A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and:

30

. . . .

> (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.

¶59.    "This court has repeatedly held that when testimony is excluded at trial, a record must be made of the proffered testimony in order to preserve the point for appeal." *Abernathy v. State*, 30 So. 3d 320, 325 (¶19) (Miss. 2010) (quoting *Murray v. State*, 849 So. 2d 1281, 1289 (Miss. 2003)).  In *Abernathy*, the trial court excluded an expert witness's testimony, finding it to be irrelevant.  *Id*.  However, after the trial court excluded the testimony, the defense failed to make a sufficient proffer.  *Id*. at (¶20).  Although the defense had discussed the witness's proposed testimony prior to and during trial, the defense did not effect a sufficient proffer at the time the court ruled.  *Id*.  On appeal, the supreme court stated that even if the expert's testimony may have been relevant,

> the record is insufficient for us to determine whether it could have survived under the Mississippi Rule of Evidence 403 balancing test for admissibility. It is incumbent upon the proponent of evidence to make an adequate record of the proposed testimony which this Court can review.  This was not done in this case[.]

*Id*.  Because the record did not contain the necessary information for the supreme court to make a determination on the admissibility of the evidence, the supreme court was unable to review the trial court's exclusion for error.  *Id*. at 326 (¶21).

¶60.    This rule applies to non-testimonial evidence as well.  In *Fontaine v. State*, 256 So. 3d 615, 622 (¶19) (Miss. Ct. App. 2018), Fontaine objected to the State's introduction of a two-minute segment of the audio-recorded polygraph interview.  We held that "[Fontaine's]

31

failure to proffer the remaining contents or substance of the audio-recorded polygraph interview constitutes a waiver of the issue on appeal." *Id.*

¶61. While "[t]he standard for effecting a proffer is a rather low threshold," a party is still required to "dictat[e] into the record what the appellant desired to show by the testimony and by the evidence." *Vaughn v. State*, 759 So. 2d 1092, 1101 (¶28) (Miss. 1999). Doing so officially indicates to this Court the purpose of the evidence. *Id.* However, where a party fails to place into the record "the *substance* of the evidence he would have offered had the court ruled otherwise[,]" and the purpose of the evidence was not "apparent from the context," the reviewing court is unable to review the decision to exclude the evidence. *Heidel v. State*, 587 So. 2d 835, 844 (Miss. 1991) (emphasis added).

¶62. In the case at hand, prior to the hearing, CPUC submitted a brief in support of its collateral estoppel argument and attached the 900-plus pages of Exhibits A through F upon which the Commission relied in making their ultimate decision to terminate Johnson. These documents included Exhibit E, a twenty-nine-page summary of the rest including board minutes. After the ALJ denied CPUC's argument on collateral estoppel, the parties proceeded to the hearing.

¶63. At the beginning of the hearing, CPUC attempted to admit the entire 900-plus pages of Exhibits A through F. The ALJ, however, questioned how it could determine that each document contained within the 900-plus page submission was relevant. Counsel for Johnson objected to the blanket-admission of the exhibits, arguing that no testimony had been produced to establish any foundation for the exhibits. The ALJ agreed and refused to admit

all 900-plus pages without CPUC first presenting testimony or proof of the authenticity and

relevancy of each exhibit. Specifically, the ALJ said:

> Ok. I'm not going to blanketly enter the entire volume of exhibits into the record because I do not know that they are relevant to this hearing at this time. In other words, the relevancy has not been established. [A] previous ruling, a ruling—the outcome of another administrative hearing or proceeding—does not really have a bearing on this case because the scope of review is different. So therefore those documents may not be . . . relevant. This sheer volume of documents makes me question whether or not every single document would be relevant to this proceeding so I'm not going to blanketly enter those documents into the record.

The ALJ specifically stated that she would determine the admissibility of a document into

evidence if and when that document is presented during the testimony of the witnesses.

Thus, the ALJ did not refuse to admit the rest of CPUC's exhibits; she only required that

their relevancy to the proceedings be established. Significantly, CPUC made no proffer at

this time concerning the substance or relevancy of any of the other individual exhibits.

Further, given the variety of the nature of the documents found in these exhibits (emails,

minutes, recordings and transcripts of phone calls made by Herring to other CPUC

employees, et cetera), it cannot be said that the substance and relevancy of the 900-plus pages

of exhibits could be deemed "apparent from the context" as noted in Rule 103.

¶64. Thereafter, CPUC laid the proper the foundation with Davis, CPUC's employer

representative, for Exhibit E, the Commission's findings, which the ALJ then admitted.[15]

CPUC then questioned Davis about another exhibit, the August 28, 2018 IVR bid. The ALJ

refused to admit that document because Davis could not authenticate the bid and because the

---

[15] Davis authenticated the exhibit and testified that the Commission had approved the findings and adopted them into their minutes.

ALJ questioned the document's relevancy to the overall charge of misconduct. However, aside from these two isolated instances, CPUC made no further attempt to introduce any of the other documents from the 900-plus pages of exhibits.

¶65.    Nor did CPUC make a proffer about any of the other exhibits at any time, either during the hearing or at the hearing's end when the ALJ specifically noted that the only exhibit that had been entered was Exhibit E. Apparently CPUC was satisfied that the admission of Exhibit E sufficiently covered the proof it wanted to offer and decided to offer nothing else. We cannot fault the ALJ for not admitting an exhibit that was not presented to her and we find no error in her approach to the admission of CPUC's documentary evidence and her blanket exclusion of the 900-pages of documents.[16]

---

[16] Sitting as an appellate court, the circuit court was bound by these same principles, i.e., that exhibits should be admitted only when their relevancy and authenticity are established in the record before the trier of fact and the offering party whose evidence is not admitted must have made a proffer of the substance, authenticity, and relevance of the excluded evidence. Because CPUC did not do this before the ALJ, the circuit court should not have granted CPUC's request to add them to the record thereafter.

Rule 10 of the Mississippi Rules of Appellate Procedure prohibits the addition to the appellate record evidence not presented to the trial court:

> (a) The parties shall designate the content of the record pursuant to this rule, and the record shall consist of designated papers and exhibits *filed in the trial court,* the transcript of proceedings, if any, and in all cases a certified copy of the docket entries prepared by the clerk of the trial court.
>
> . . . .
>
> (f) Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate, and complete account of *what transpired in the trial court with respect to those issues that are the bases of appeal.*

In this case, with the exception to Exhibit E, the ALJ did not consider the rest of the CPUC's

34

¶66. The separate opinion disagrees and would hold that without the wholesale admission of board minutes, despite their contents, CPUC was deprived of its ability to prove its grounds for termination. But due process, as noted in the separate opinion here, only requires "that a party be afforded the *opportunity* to present all evidence." *Keeton ex rel. Gray v. Ocean Springs Sch. Bd.*, 281 So. 3d 889, 894 (¶18) (Miss. Ct. App. 2019) (emphasis added). Here, CPUC was given every opportunity to present whatever documents it thought were relevant. Nothing prevented the CPUC from calling witnesses, such as its independent investigator, and laying the foundation for the admission of the materials it considered critical to its own findings. The burden should not fall on the ALJ to weed through 900 pages of documents and determine on its own what is relevant. That is why our Rules of Evidence require that a foundation be laid and the relevancy of the evidence be proved by the presenting party. *Jackson v. State*, 263 So. 3d 1003, 1009 (¶10) (Miss. Ct. App. 2018) ("Authentication of evidence requires the offering party to lay a proper foundation."). Even though the rules of evidence are relaxed in administrative proceedings, some foundation for specific evidence needs to be laid. Otherwise, a party could admit hundreds, if not thousands, of pages of evidence at one time and avoid its burden of proving the relevancy of the contents.

*ALJ Discretion to Admit Evidence*

¶67. Moreover, CPUC's additional exhibits were not necessary because CPUC had established information contained in them by the admission of Exhibit E. Thus, we agree

---

900 pages of documents, and no proper proffer of each of them was made. Accordingly, the circuit court should not have supplemented the record to include them.

with the circuit court that the *Dailey* case is relevant to Johnson's facts here. In *Dailey*, the unemployment benefits claimant who had been employed by the Grenada Tourism Commission sought to enter past Commission board minutes to show that she was terminated and had not resigned. *Dailey*, 271 So. 3d at 717 (¶9). The ALJ did not admit the minutes because Dailey had already testified about ongoing personnel issues with the Commission, *id.* at (¶11), and because the ALJ found that her assertion of termination had been competently made with other evidence. *Id.* at (¶12). In the case at hand, although CPUC did have Commission minutes among its other documents, the information and materials from those minutes were included in the twenty-nine-page summary that the Commission had also prepared and adopted in its minutes. Therefore, in this case, the Commission did "speak through its minutes" in Exhibit E, which competently covered the Commission's assertions concerning Johnson's termination.[17]

¶68. In summary, we find that the ALJ did not improperly refuse to admit CPUC's exhibits; it merely required that there be laid a foundation for the relevance of any proposed exhibit. Moreover, CPUC failed to make a proper proffer of the exhibits it contends were erroneously excluded. We further find that the ALJ did not abuse its discretion in refusing to blanketly admit the rest of CPUC's exhibits, especially when CPUC's claims were fully asserted in

---

[17] The separate opinion would distinguish *Dailey* by pointing out that there was no testimony from a member of the public board offered in *Dailey* and that the minutes were never provided. However, if anything, these facts make *Dailey* even more relevant to Johnson's case because a board member did testify to lay the foundation for Exhibit E, which was included in the board minutes and which summarized the rest of CPUC's proof. Moreover, the ALJ never prohibited the admission of other board minutes; the ALJ only required a proper foundation be laid, which CPUC chose not to do.

Exhibit E, its findings, which the ALJ did admit.

### III. Whether the circuit court abused its discretion in affirming the ALJ's decision that Johnson had not committed disqualifying misconduct or insubordination.

¶69. In the alternative, CPUC argues it had met its burden of proving that Johnson had committed disqualifying misconduct or insubordination under MDES statutes and regulations. We disagree.

¶70. Under Mississippi Code Annotated section 71-5-513, the burden of proving an employee's misconduct is on the employer:

> (b) For the week, or fraction thereof, which immediately follows the day on which he was discharged for misconduct connected with his work, if so found by the department, and for each week thereafter until he has earned remuneration for personal services performed for an employer, as in this chapter defined, equal to not less than eight (8) times his weekly benefit amount, as determined in each case.
>
> (c) The burden of proof of good cause for leaving work shall be on the claimant, and the burden of proof of misconduct shall be on the employer.

Analyzing this section, the Mississippi Supreme Court in *Wheeler* stated:

> There is little disagreement that work-connected negligence or inefficiency constitutes "misconduct" within the meaning of the applicable statute precluding a discharged employee from unemployment compensation benefits when of such degree or recurrence as to manifest *culpability, wrongful intent, evil design, or an intentional and substantial disregard of an employer's interests or of an employee's duties and obligations*.

*Wheeler*, 408 So. 2d at 1384 (emphasis added). Therefore, it is clear that in order for an employee to be considered ineligible for unemployment benefits, the employer must prove that the employee's acts manifest "culpability, wrongful intent, evil design, or an intentional and substantial disregard of an employer's interests or of an employee's duties and

37

obligations." *Id*. In addition, "the employer bears the burden of proving misconduct by substantial, clear, and convincing evidence." *City of Grenada v. Miss. Dep't of Emp. Sec.*, 320 So. 3d 523, 526 (¶16) (Miss. 2021) (citing *Jackson Cnty. Bd. of Supervisors v. Miss. Emp. Sec. Comm'n*, 129 So. 3d 178, 183 (¶12) (Miss. 2013)).

> Clear and convincing evidence produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact-finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Parra v. Parra*, 65 So. 3d 872, 878 (¶17) (Miss. Ct. App. 2011).

### *Johnson's Misconduct*

¶71. On appeal, CPUC argues two bases for considering Johnson guilty of misconduct: first, Johnson's unfounded reports to the Mayor and Board of Aldermen that the Commission was incompetent and should be removed, and second, Johnson's alleged violations of numerous workplace rules and policies.

### Reports to the Mayor and Board of Alderman

¶72. Concerning its first argument, CPUC cites no caselaw or precedent to support its contention that Johnson was guilty of misconduct because he made allegations against the Commissioners. "Generally, a party's failure to cite any authority in support of an argument precludes this Court from addressing that argument on appeal." *Smith v. Miss. Dep't of Pub. Safety*, 348 So. 3d 993, 1002 n.5 (Miss. Ct. App. 2022) (citing *Hale v. State*, 191 So. 3d 719, 724 n.1 (Miss. 2016)). Accordingly, we will not consider CPUC's argument that Johnson was guilty of misconduct based on his reports to the municipal authorities.

## Policy Violations

¶73.    CPUC next argues that Johnson was guilty of misconduct because he allegedly violated several of CPUC's policies, including violation of the single-source purchase policy and other expenses; coercion of an employee to file a sexual harassment claim against a CPUC Commissioner; the illegal recording of CPUC telephone lines; and inefficiency regarding a new metering system.  However, Johnson provided an explanation for each alleged violation, and given the deference afforded to the fact-finding of the ALJ, we agree that the evidence presented on this conduct did not meet the high burden of proof required to show disqualifying misconduct.

¶74.    For example, CPUC's former Commissioner Davis testified that Johnson had purchased the IVR recording system without public bidding and without the consent of the Commission in violation of the single-source policy.  However, Johnson testified that he had submitted the single-source purchase to the Commission for approval, but they had neglected to enter the approval into their minutes.  Concerning this issue of the recording of phone calls, Johnson denied that he had authorized it, and CPUC presented no definitive proof that he did.  According to CPUC's findings in Exhibit E, the FBI ultimately declined to investigate the matter.  Davis testified Johnson violated CPUC policy by releasing personnel files to a local radio station.  However, CPUC presented no evidence to establish the Johnson had in fact done this and Johnson denied doing so.  Davis further testified that Johnson had initially refused to be interviewed by Herring; however, the CPUC's Exhibit E reflects that after retaining counsel, Johnson did comply and was interviewed. "The supreme court has

held that an isolated incident is not a constant or continuing intentional refusal [to obey a direct or implied order]." *Gammage*, 113 So. 3d at 1297 (¶¶13, 15) (citing *Gore v. Miss. Emp. Sec. Comm'n*, 592 So. 2d 1008, 1010 (Miss. 1992)).

¶75.    There are several other examples where the evidence was in dispute as to whether Johnson violated CPUC's policies but little that established any violation was wilfull or intentional.  Davis testified that Johnson violated CPUC policies and an opinion by the Attorney General by installing Wi-Fi boxes on CPUC utility poles for a private group at no cost.  However,  Johnson testified that the requestor was the City of Clarksdale, a public entity that had established the CPUC.  He stated that the City and CPUC had often cooperated on the use of equipment in the past and actually had a set procedure for processing such requests.  Thus the city's request for the installation of the Wi-Fi boxes did not violate the Attorney General's opinion or policy. The ALJ had to decide which argument to accept, and it is not our role to second-guess the ALJ.

¶76.    Davis further testified that Johnson pressured Profit to make a false accusation of sexual harassment against a Commissioner.  Although Profit testified that she felt pressured by Johnson to file a complaint, she also testified that Johnson may have been acting on misinformation that she may have been harassed by a Commissioner provided to him by others.

¶77.    Finally, the CPUC argues that Johnson inefficiently handled a metering infrastructure project. As has been previously stated, "mere inefficiency . . . [is] not considered 'misconduct' precluding a discharged employee from unemployment benefits." *Wheeler*, 408

So. 2d at 1383. Thus, any allegations regarding Johnson's inefficiency, unless evidenced to have amounted to "culpability, wrongful intent, evil design, or an intentional and substantial disregard of an employer's interests or of an employee's duties" is not sufficient to prove misconduct as defined by MDES. *Id*. The ALJ did not find compelling evidence that Johnson's alleged inefficiency manifested the necessary culpability to find that it rose to the degree of misconduct.

¶78. After considering the witnesses' testimony, the ALJ found that CPUC had failed to meet its burden of producing clear and convincing evidence supporting its claim of misconduct. In unemployment benefits cases, "[i]t is the role of the agency, in its expertise, to determine the weight of the evidence and the credibility of the witnesses." *Jackson Cnty.*, 129 So. 3d at 183 (¶15). The credibility of witnesses "is a matter for the Board—not this [C]ourt—to decide." *Franklin Collection Serv. Inc. v. Miss. Dep't of Emp. Sec.*, 181 So. 3d 304, 309 (¶20) (Miss. Ct. App. 2015) (finding that "where there is substantial evidence, an agency's fact finding must be allowed to stand even though there might be room for disagreement on that issue"). Having reviewed the record, we find that there was substantial evidence for the ALJ to find that CPUC had not met the burden of proof required to establish misconduct because of Johnson's alleged violations of CPUC policies.

*Insubordination*

¶79. "Insubordination is defined as a constant or continuing intentional refusal to obey a direct or implied order, reasonable in nature, and given by and with proper authority." *Gammage v. Miss. Dep't of Emp. Sec.*,113 So. 3d 1294, 1297 (¶13) (Miss. Ct. App. 2013)

(citing *Gordon v. Miss. Emp. Sec. Comm'n*, 864 So. 2d 1013, 1019 (¶27) (Miss. Ct. App. 2004)). CPUC cites two instances that it considered sufficient to show Johnson's insubordination: first, his installation of the Wi-Fi boxes on utility poles, and Johnson's "efforts to convince the City Mayor and Board to intervene in the Commissioner's internal personnel decisions by reversing his suspension." But the record does not reflect that Johnson was specifically instructed not to install the boxes, and that he intentionally and deliberately contravened that instruction. Rather, the record reflects that this matter arose after the fact, during Herring's investigation into Johnson's management of the utility. There was also a dispute concerning who requested the Wi-Fi installation—a public entity (the City) or a private entity (the Revitalization Project). Further, just as CPUC did when it argued that Johnson's reports to the mayor and board of aldermen constituted misconduct, CPUC cites no authority to support its claim that Johnson's reports or installation of the Wi-Fi boxes constituted insubordination.

¶80. Mississippi Code Annotated section 71-5-531 provides that "[i]n any judicial proceedings under this section, the findings of the [Board] as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law." *City of Grenada*, 320 So. 3d at 525 (¶12). Because the record supports the ALJ's factual finding, we accept it as conclusive. Accordingly, we find no error by the ALJ because, as stated in *Wheeler*, "good faith errors in judgment or discretion" are not considered misconduct for the purposes of determining eligibility for unemployment benefits. *Wheeler*, 408 So. 2d at 1383; *see also Greenwood Pub. Sch. Dist.*

42

*v. Miss. Dep't. of Emp. Sec.*, 962 So. 2d 684, 687 (¶7) (Miss. Ct. App. 2007)).

¶81.    In accordance with the deferential and limited standard of review, we find that the decision of the circuit court and the MDES Board of Review upholding the ALJ's grant of benefits in this case was supported by substantial evidence, was not arbitrary or capricious, was within the agency's authority, and did not violate any party's constitutional rights.

## CONCLUSION

¶82.    We find that the circuit court did not abuse its discretion in affirming the Board of Review and ALJ's decision, and as a matter of law, the judgment of the circuit court should be affirmed.  MDES was not collaterally estopped from determining whether Johnson was disqualified from receiving benefits because of disqualifying misconduct because statutes and regulations governing MDES and those governing CPUC have different definitions and standards for establishing misconduct.  Further, the ALJ did not err in refusing to blanketly admit the 900-plus pages of exhibits that CPUC initially offered because CPUC had not established a foundation for the admission of each of the exhibits. Thereafter, CPUC itself only attempted to enter two exhibits, one of which was allowed.  If CPUC desired that others be admitted but were not, CPUC failed to make a sufficient proffer of the substance of the evidence contained in the documents.  Lastly, the circuit court did not abuse its discretion in finding sufficient evidence in the record to support the finding of the ALJ and MDES Board of Review that Johnson did not commit disqualifying misconduct or insubordination under the definition used by MDES. Accordingly, we affirm the circuit court's judgment.

¶83.    **AFFIRMED.**

**SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS AND McCARTY, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE AND LAWRENCE, JJ. BARNES, C.J., NOT PARTICIPATING.**

**CARLTON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶84. Because I find that the ALJ erred in excluding the Clarksdale Public Utilities Commission's minutes and exhibits, I respectfully concur in part and dissent in part from the majority's opinion.

¶85. The record shows that the Commission terminated Johnson's employment after finding that he committed disqualifying misconduct and insubordination pursuant to MDES statutes and regulations. Johnson filed a claim for employment benefits, which the MDES claims examiner granted. The Commission appealed this decision, and a hearing before the MDES ALJ was scheduled.

¶86. The record reflects that prior to the MDES evidentiary hearing, the Commission submitted certified copies of the relevant minutes, the transcript of the pre-disciplinary hearing, and all the exhibits referenced by the Commission's "Findings of Fact and Conclusions." The ALJ ruled that she would not admit all the documents because the relevancy of all the documents had not been established at that time. The ALJ explained that the "sheer volume of the documents"—over 900 pages—made her "question whether or not every single document would be relevant to this proceeding." As acknowledged by the majority, the Commission made no proffer at this time concerning the substance or relevance

44

of the individual exhibits. The ALJ also compelled the testimony of a board member, despite the Commission's objection. The board member provided testimony consistent with the "Findings of Facts and Conclusions."

¶87. After the hearing, the ALJ found that while Johnson was guilty of insubordination, the Commission's evidence failed to establish that Johnson engaged in misconduct. The ALJ explained that

> the evidence does not establish that [Johnson] intentionally circumvented and/or violated policies and procedures. The evidence does not show that the claimant directed that all telephone lines be recorded or that he intentionally withheld information regarding said recording from the employer. Much of the evidence presented reflects poor judgment on the claimant's part. The claimant's actions must be considered in light of the employer's allegations of possible criminal wrongdoing and the alleged notification of federal authorities. . . . The Commission did not claim that Johnson was responsible for the unauthorized recording of all telephone lines. Employer was within its rights to terminate the claimant's services for any reason that it deems necessary; however, misconduct connected with the work has not been established.

The Commission appealed the ALJ's decision to the Board of Review, which affirmed the decision of the ALJ. The Commission then appealed to the circuit court, which also affirmed. This appeal followed.

¶88. On appeal, the Commission argues that the ALJ erred by excluding its minutes and the corresponding exhibits. The Commission acknowledges that its board member provided testimony consistent with the "Findings of Fact and Conclusions" at the hearing before the ALJ; however, the Commission asserts that the findings and conclusions failed to provide a complete basis for Johnson's "for cause" termination. Rather, the Commission maintains that its minutes and the exhibits provided direct evidence of Johnson's insubordination and

45

misconduct, and the ALJ's refusal to admit these documents prevented the Commission from proving its grounds for terminating Johnson. The exhibits the ALJ excluded included evidence obtained as a result of the independent investigation into whether Johnson recorded phone calls without disclosure—namely, the sworn statements of nine employees, as well as emails sent by Johnson, purchase records, affidavits, and other documents. Based on these documents, the Commission found that Johnson implemented a system to record all phone calls received and made from Clarksdale Public Utilities and that he implemented this system without the knowledge or approval of the Commission. The minutes and the exhibits also show other instances of insubordination and misconduct by Johnson, including that Johnson approved "inappropriate expenditures" in violation of statutes applicable to purchases made by the Commission; that he attempted to obtain a sworn statement from a Commission employee claiming that a Commissioner sexually harassed her after the employee expressed that she did not want to file a complaint, which led to the employee filing a grievance against Johnson regarding his attempted coercion and harassment of her; and that Johnson's inefficient management of the Commission's Advanced Metering Infrastructure Project led to unusually high utility bills for customers and damaged the public's perception of the Commission. After my review, I find that the ALJ's exclusion of this evidence denied the Commission an opportunity to fully prove their grounds for terminating Johnson.

¶89.    The majority finds, however, that the ALJ did not err in excluding the documents submitted by the Commission. The majority explains that the "Findings of Fact and Law," which the ALJ admitted into evidence, established the information contained in the exhibits,

46

and therefore the exhibits were not necessary. In support of its decision, the majority relies on *Dailey v. Mississippi Department of Employment Security*, 271 So. 3d 715 (Miss. Ct. App. 2018).

¶90. In *Dailey*, the Grenada Tourism Commission's (GTC) board accepted the resignation of Charlotte Dailey, a GTC employee. *Id*. at 717 (¶4). Dailey filed for unemployment benefits, and the claims examiner ultimately found that she was disqualified from benefits. *Id*. at 717 (¶5). Dailey then appealed to the MDES administrative law judge (ALJ), who held a telephonic hearing and determined that Dailey voluntarily resigned her employment without good cause. *Id*. at (¶6). During the hearing, Dailey asked that the GTC board's minutes be entered into evidence. *Id*. at 718 (¶10). The ALJ asked Dailey how the minutes were relevant, and Dailey responded, "Ongoin' personnel issues. They didn't show any personnel issues bein' discussed with me over the past year." *Id*. Because Dailey had already testified regarding the continuing personnel issues, the ALJ did not admit the minutes. *Id*. at (¶11).

¶91. In reviewing Dailey's case on appeal, this Court acknowledged that "it is well established that formal rules of practice, procedure, and evidence are more relaxed in proceedings before administrative agencies than in courts of law." *Id*. at (¶12). We recognized, however, that "ideas of fundamental fairness should prevail." *Id*. "As a practical matter, an ALJ must have some discretion to control the presentation of evidence." *Id*. This Court ultimately found that the ALJ did not act arbitrarily or capriciously in declining to admit the board's minutes into evidence. *Id*. Dailey informed the ALJ that she wanted the minutes admitted into evidence to show that there were no ongoing personnel issues, and the

47

ALJ declined to admit the minutes after finding that Dailey's "assertion had been competently made with other evidence." *Id.* This Court also clarified that Dailey never provided the minutes to the ALJ, and therefore they were not in the appellate record. *Id.* Relevant to the present case, no testimony from a member of the public board was offered, admitted, or required by the ALJ in Dailey's case. Hence, *Dailey* differs from the case now before us.

¶92. In the case before us, the Commission appealed the ALJ's decision to exclude the Commission's minutes and exhibits. In its brief to the circuit court, the Commission argued that the entirety of the minutes should have been admitted for the purposes of

> plac[ing] in proper context the notice to Johnson of the due process hearing, his being made aware of the charges of misconduct being made against him, the conduct of the hearing itself (at which Johnson was represented by counsel and allowed the opportunity to present such evidence that he desired), and the actual factual testimonial and documentary evidence received by that municipal tribunal at that hearing.

The circuit court rejected this argument and affirmed the rulings of the ALJ and MDES Board of Review after finding that the ALJ did not err by refusing to admit the Commission's minutes and exhibits. The circuit court explained that the ALJ "permitted other competent evidence of such alleged misconduct . . . [and] heard substantial oral testimony from a board member that largely echoed the content of the board minutes as well as the findings of fact and conclusions." However, the circuit court expressed "some concern as to whether the board member should have been compelled to testify." The circuit court ultimately found that compelling the board member's testimony amounted to harmless error that "would not justify the reversal of the entire case, especially considering that the assertions were made

48

by other competent evidence as allowed by the *Dailey* case." The circuit court also found that Commission failed to identify any substantial right that has been affected by the ALJ's solicitation of the testimony from its board member.

¶93. After reviewing the Commission's minutes and the exhibits in the record before us, I find that the ALJ's refusal to admit this evidence deprived the Commission of its ability to sufficiently prove its grounds for terminating Johnson. Although the "formal rules of practice, procedure, and evidence are more relaxed" in administrative proceedings, "due process always stands as a constitutionally grounded procedural safety net in administrative hearings." *Sherman-Oliver v. Pub. Emps. Ret. Sys. of Miss.*, 291 So. 3d 387, 395 (¶36) (Miss. Ct. App. 2020). The supreme court has clarified that due process requires a party be afforded the opportunity "to present all relevant evidence" and to allow a party's claims to be heard "at a meaningful time and in a meaningful manner." *Keeton ex rel. Gray v. Ocean Springs Sch. Bd.*, 281 So. 3d 889, 894 (¶18) (Miss. Ct. App. 2019) (quoting *Warnick v. Natchez Cmty. Hosp. Inc.*, 904 So. 2d 1019, 1023 (¶19) (Miss. 2004)). Furthermore, in the notice of the hearing before the ALJ, which MDES provided to both Johnson and the Commission, MDES states that "[a]t the hearing, you will have the opportunity to present all evidence and facts as may be proper and pertinent to your appeal." By excluding the minutes and exhibits, the AJ denied the Commission its opportunity to be heard in a meaningful manner and to present all the evidence and facts pertinent to its appeal. Rather than allowing the Commission to present all the evidence it relied on in deciding to terminate Johnson's employment, the ALJ instead erroneously relied on the testimony of one Commissioner.

49

¶94. Additionally, the Mississippi Supreme Court has found error where a court allowed individual members of a public board to testify "what the board did, and what the board understood, and what the board had authorized to be done in the premises." *Smith v. Bd. of Sup'rs of Tallahatchie Cnty.*, 124 Miss. 36, 86 So. 707, 709 (1921). The supreme court explained that a public board "can act only as a body, and its act must be evidenced by an entry on its minutes." *Id*. The supreme court has clearly stated that the board's minutes "are the sole and exclusive evidence of what the board did." *Id*.; *see also Tinseltown Cinema LLC v. City of Olive Branch*, 158 So. 3d 367, 374 (¶22) (Miss. Ct. App. 2015) ("[O]ne member of [a public] [b]oard does not necessarily speak for the whole."). Accordingly, I find that the ALJ erred by excluding the minutes and exhibits submitted by the Commission. I would therefore reverse the circuit court's judgment and remand this case to MDES for a new hearing, with instructions for MDES to admit into evidence the Commission's minutes and corresponding exhibits.

**GREENLEE AND LAWRENCE, JJ., JOIN THIS OPINION.**